IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E D
JUL 2 2 2010
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| SPLITFISH AG, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:10cv297 |
| | ) | |
| BANNCO CORPORATION, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

At issue on plaintiffs' motion for preliminary injunctive relief in this copyright and trademark infringement action is whether plaintiffs have satisfied the four requirements of the Fourth Circuit's recent opinion in *Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009). In their motion, plaintiffs Splitfish AG, Splitfish Gameware Inc., and Nabon Corporation request that defendants be enjoined from selling or offering for sale a video game controller device that allegedly contains copyrighted computer programming code plaintiffs claim they own. Defendants contend that plaintiffs have failed to establish entitlement to preliminary injunctive relief under *Real Truth*'s four-factor test. The matter, having been exhaustively briefed and argued, is now ripe for disposition.

I.[1]

The original plaintiffs in this matter are Splitfish AG, a Swiss public corporation, and Splitfish Gameware Inc. ("Gameware"), a Canadian corporation and a wholly-owned subsidiary of Splitfish AG. In their amended verified complaint dated July 14, 2010, an additional plaintiff,

---

[1] The facts and factual allegations recited herein are derived from the amended verified complaint, declarations and other exhibits attached to the parties' pleadings, and from the record taken as a whole.

Nabon Corporation ("Nabon"), was added to the case.[2] Nabon is a Canadian corporation and a wholly-owned subsidiary of Splitfish AG.

Defendant Bannco Corporation ("Bannco") is a Delaware Corporation whose principal place of business is in Virginia. Defendant Bannco Corporation (Shenzhen) is a wholly owned subsidiary of Bannco that is incorporated and based in Shenzhen, China. Defendant Ju Ning is Bannco's director.[3]

Plaintiffs are in the business of producing, marketing, and distributing video game controller devices. Specifically, since at least 2007, plaintiffs have produced and distributed controllers under the marketing name "FragFX." These controllers, which are compatible with Sony Corporation's popular PlayStation 2 and PlayStation 3 video game consoles and also with personal computers, are distinct from most video game controllers insofar as they are really two separate devices. In other words, whereas a typical video game controller is composed of a single piece of plastic containing various buttons and toggle sticks and is designed to be held with both hands, a FragFX device comes in two pieces, each designed to be operated with a separate hand. One of the pieces resembles half of a typical video game controller, whereas the

---

[2] Nabon was added to the case pursuant to the Order dated July 8, 2010, and with defendants' consent. This amendment was necessary to cure a potential jurisdictional defect arising from the fact that ownership of the copyrighted materials here in issue was most likely vested in Nabon at the time the original verified complaint was filed in this case, and thus the original plaintiffs lacked standing to sue for infringement. The July 8, 2010 Order indicated that plaintiffs could not make the required clear showing of a likelihood of success on the merits of the copyright infringement claim unless Nabon was added to the case. *See Splitfish AG v. Bannco Corp.*, No. 1:10cv297 (E.D. Va. July 8, 2010) (Order).

[3] Plaintiffs have also named John Doe defendants in this action, but as preliminary injunctive relief is not sought against these unnamed defendants, their presence in the case is not material to disposition of plaintiffs' motion.

other piece closely resembles a computer mouse. The two pieces are connected to each other and to the video game console either by wire or wirelessly, depending on the specific model. The record reflects that various publications and websites have recognized the novelty and innovativeness of the FragFX series of controllers since their introduction in 2007. The record further reflects that plaintiffs have invested substantial resources in marketing the FragFX series inside and outside the United States, and indeed, FragFX controllers are widely available for purchase on the Internet.

Innovative though they may be, like all computer peripherals a FragFX controller is nothing more than a piece of plastic (or, in this case, two pieces of plastic) without two essential pieces of computer programming code. The first program is the "firmware," which in common parlance informs the device how to process various inputs. By way of simplified example, when a user depresses the "Δ" button on the FragFX's right-hand controller, the firmware must direct the device to transmit a specific signal to the console in order for the user input to have the desired effect in the video game. The second program, the "driver," is essentially the bilingual interpreter of the computer world insofar as it translates signals between device and console so that these devices understand each other. Without a driver, the device would be forced to speak directly in the language of the console and thus a single device could not be compatible with multiple consoles that speak different languages. Instead, when a proper driver is available, a user need only load the driver into the console's memory to ensure that the console can communicate with the device.

Thus, in order to ensure that the FragFX controller would be more than a futuristic-looking paperweight, plaintiffs in 2006—prior to the product line's initial 2007

release—undertook to create firmware and driver software for the devices. To this end, Nabon, which at the time maintained an office in Beijing, directed Gui Ming Feng and You Bing Wang to create the code. Whether Gui and You were employees or independent contractors is hotly disputed by the parties. The record reflects that Gui had a desk, computer, and telephone extension in Nabon's Beijing office, that he had company business cards, was paid monthly from the regular employee payroll, received company stock in Splitfish AG's initial public offering, and was at one point considered for a promotion to Vice President.[4] Notwithstanding these undisputed facts, defendants proffer an affidavit from Gui in which he claims conclusorily that he was an independent contractor and not an employee of Nabon during the relevant times in 2006. Defendants also claim that Gui and You were independent contractors because Nabon made no deductions from their monthly paychecks, permitted them to set their own work hours and generally allowed them to control the means through which they performed their computer programming work. In any event, Gui and You created the firmware and driver code, and plaintiffs used this code in the course of producing the FragFX controllers.

In June 2008, three senior executives of Splitfish AG left the company, including the company's president, Ken Tetterington, and a vice president, Nan Liu. Plaintiffs allege that Liu took with him the company's only copy of the source code for the FragFX controllers' firmware and drivers. Thereafter, in April 2009, Tetterington introduced a competing video game controller product named the "mLani MoBi," which bore certain resemblances to the FragFX device. Plaintiffs challenged the legality of Tetterington's actions, after which mLani agreed to cease selling the controller. Then, in September 2009, plaintiffs became aware that defendants

---

[4] The record does not reflect whether You was afforded these same privileges.

were selling a new competing controller device known as the "FRAGnStein" that is extremely similar in appearance and function to the FragFX line of devices. While plaintiffs are not yet aware of Tetterington's precise role with defendants, the FRAGnStein demonstration videos contained on defendants' website are narrated by Tetterington, indicating that he is somehow directly involved with defendants' business. Additionally, plaintiffs found that upon installation of the FRAGnStein controller driver, the name "FragFX(TM)" appears on a Windows PC as the device name, further increasing their suspicions of copying.

Based on these suspicions, plaintiffs hired an expert hardware and software designer, Dr. Robert Zeidman, to compare the object code of plaintiffs' and defendants' programs. Zeidman's examination revealed at least a dozen instances in which the similarities in the object code could not be explained by commonality of authorship alone. In other words, in at least a dozen places, the identity of the object code in the two products' driver and firmware software indicated that the only possible cause of similarity was that defendants' code was copied from plaintiffs' code. Specifically, Zeidman noted that there is no reason why the term "FragFX"—plaintiffs' trade name—should appear in the code of defendants' product, and that this was strong evidence that the code had been copied wholesale. Defendants contend (i) that the similarity is due only to the common authorship of the code, as they allegedly hired Gui and You to produce their code, and (ii) that the instances of inexplicable identity noted by Zeidman are *de minimis* copying and not actionable under the Copyright Act.

In their amended verified complaint, plaintiffs allege (i) trademark infringement and unfair competition and (ii) copyright infringement, and accordingly seek damages and injunctive relief against defendants. They seek preliminary injunctive relief only on the copyright claim.

-5-

Defendants oppose plaintiffs' motion, arguing that the requirements of *Real Truth* have not been

met. For the reasons that follow, preliminary injunctive relief against the sale of devices

containing the copyrighted driver or firmware code is appropriately granted at this time.

## II.

In *Real Truth*, the Fourth Circuit, applying the Supreme Court's recent opinion in *Winter

v. Natural Res. Def. Council*, 129 S. Ct. 365 (2008), upended the "sliding scale" approach to

preliminary injunctive relief previously set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*,

550 F.2d 189 (4th Cir. 1977).[5] The *Real Truth* panel explained that to establish entitlement to

preliminary injunctive relief, a plaintiff now must separately meet four requirements, and the

failure to satisfy any of the four means that a preliminary injunction may not issue. The four

requirements are:

> (i) "a clear showing that [the plaintiff] will likely succeed on the merits at trial";
>
> (ii) "a clear showing that [the plaintiff] is likely to be irreparably harmed absent preliminary relief";
>
> (iii) that "the balance of equities tips in [the plaintiff's] favor"; and
>
> (iii) consideration of "the public consequences in employing the extraordinary remedy of injunction" favors granting preliminary injunctive relief.

*Real Truth*, 575 F.3d at 346–47 (quotation marks and citations to *Winter* omitted). Thus,

---

[5] Defendants fail to acknowledge that *Blackwelder* is no longer good law, even though the new standard of *Real Truth* clearly elevates plaintiffs' burden. Separately, it is worth noting that the Fourth Circuit recently vacated and remanded the portion of *Real Truth* applying the federal election law that was invalidated by the Supreme Court in *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010). But, the panel simultaneously reissued the parts "stating the facts and articulating the standard for the issuance of preliminary injunctions." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 607 F.3d 355, 355 (4th Cir. 2010) (Order). Thus, *Real Truth* remains good law insofar as it relates to the preliminary injunction issues presented here.

plaintiffs must satisfy each of these requirements with respect to the copyright infringement

claim based on the content of the amended verified complaint and the various declarations and

exhibits contained in the record, or else they are not entitled to preliminary injunctive relief. The

analysis therefore turns to whether plaintiffs have met their burden under *Real Truth*.

## III.

### A. Likelihood of Success on the Merits

The elements of a copyright infringement claim are (i) ownership of a valid copyright and

(ii) copying of constituent elements of the work that are original. *See Feist Publ'ns, Inc. v. Rural

Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). These two elements are separately addressed.

With respect to ownership, the primary outstanding dispute[6] is over whether the

programming code is a work made for hire in which ownership vested originally in Nabon.

Where, as here, a disputed work is produced abroad, courts must look to the law of the country of

the work's origin to determine ownership. *See Itar-Tass Russian News Agency v. Russian

Kurier, Inc.*, 153 F.3d 82, 90–91 (2d Cir. 1998) (holding that "the law of the country of origin

determines the ownership of copyright" and thus looking to Russian law to determine ownership

of a work produced by Russian nationals and first published in Russia). And on this issue,

plaintiffs provide an uncontested declaration of Anna M. Han, a tenured law professor at Santa

Clara University in California.[7] Professor Han is an expert on Chinese trade and investment law

---

[6] As discussed in footnote 1 above, a previous issue with respect to the effectiveness of an assignment of the copyrights from Nabon to Splitfish AG was rendered moot by plaintiffs' amended complaint, which added Nabon as a plaintiff to this suit.

[7] Defendants declined to provide a declaration from a Chinese law expert despite being warned that failure to do so could result in an adverse ruling on the threshold ownership question. *See Splitfish AG v. Bannco Corporation*, No. 1:10cv297 (E.D. Va. June 22, 2010)

who has written about Chinese intellectual property law.[8] In her declaration, Professor Han states as follows:

> Under Chinese Copyright Law, the general rule is that work for hire belongs to the author . . . . [However, c]omputer software is NOT covered by this rule as it is one of the excepted works listed in paragraph two of Article 16. Instead, paragraph two states that if computer software (along with engineering designs, maps etc.) is created using the company's resources and the company takes responsibility for the software, then the software belongs to the company *ab initio* and the two year rule is inapplicable.

Han Decl. at 3–4. Professor Han also states that the Chinese Copyright Law cross-references the Chinese Computer Software Protection Regulations to provide further detail on when software is owned by a legal entity instead of the individual author. And Professor Han quotes Article 13 of the Regulations as follows:

> Where a piece of software developed by a natural person working in a legal entity or other organization in the course of his service involves one of the following circumstances, the copyright therein shall be enjoyed by such legal entity or organization . . . :
>
> . . .
>
> > (3) the software is developed based on the development objective explicitly designated in the line of his service duty;
> >
> > (4) the software is a foreseeable or natural result of his work activities in the line of his service duty; or
> >
> > (5) the software is developed mainly with the material and technical resources of the legal entity or other organization, such as funds,

(Order).

---

[8] Under Rule 44.1, Fed. R. Civ. P., foreign law determinations are treated as questions of law requiring de novo review, although they previously were considered to be questions of fact. *See Sec. & Exchange Comm'n v. Dunlap*, 253 F.3d 768, 777 (4th Cir. 2001). In determining the content of foreign law, courts may consider declarations from foreign law experts and other evidence submitted by the parties, and a court may also take judicial notice of the content of foreign law. *See* 9A Wright et al., *Federal Practice & Procedure* § 2444.

special equipment or unpublished special information, and the legal entity or other organization assumes the responsibility therefor.

Han Decl. at 4. Based on these provisions of the Chinese Copyright Law and the Computer Software Protection Regulations, and based further upon her review of the record in this case, Professor Han concluded that ownership of the programming code vested originally in Nabon, and not in Gui or You, as a matter of Chinese law.

On this basis, plaintiffs have made a clear showing that ownership of the programming code vested originally in Nabon. This is so because the Chinese Copyright Law defines works created in the course of employment broadly to include any "work created by a citizen in the fulfillment of tasks assigned to him by a legal entity or other organization."[9] As the programming code here in issue is indisputably a "foreseeable or natural result of his work activities," and further as the work was created in fulfillment of a task assigned to him by Nabon, it appears clear that as a matter of Chinese law, the ownership of the programming code vested originally in Nabon, and not in the authors Gui and You. Plaintiffs have therefore met their burden to show a clear likelihood of success on the issue of whether one of the plaintiffs owns the driver and firmware code and therefore has standing to sue for copyright infringement.[10]

Defendants do not dispute that the code in issue is sufficiently "original" to constitute properly copyrightable material, but instead they contend that plaintiffs have shown only *de minimis* copying of "non-functional" elements of the programming code. Opp. at 8. To the

---

[9] Article 16, Chinese Copyright Law, as provided by Professor Han.

[10] Neither reached nor decided here is whether the retroactive assignment of copyrights from Nabon to Splitfish AG, executed in June 2010, is valid. As both Nabon and Splitfish AG are plaintiffs in this case, it is sufficient at this stage to conclude that one of them owns the code in issue.

extent defendants suggest that nonfunctional elements of a computer program are not

copyrightable, they could not be more wrong. Indeed, only those elements of a work *not* required

to serve the work's functional purpose are the proper subject matter of copyright. *See Computer

Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 705 (2d Cir. 1992) (noting, in case involving

copyrightability of computer software, that copyright law does not protect "expression which

must necessarily be used as incident to the work's underlying concept") (internal quotation marks

omitted). But going beyond this point, plaintiffs do not contend that the lines of defendants'

object code that refer to "FragFX," plaintiffs' product, are the *only* lines of code that defendants'

copied; rather, they argue that the blatant copying of these nonfunctional elements is strong

evidence that defendants copied the *entire programs* and then made relatively minor changes to

adapt the work to defendants' product and to conceal their copying. And indeed, in their

opposition brief, defendants *admit* that the software engineers who designed defendants' code

began with plaintiffs' code and then made changes to eliminate any references to FragFX, and

they simply missed a few:

> These software engineers inadvertently allowed a couple of non-functional references
> to "FragFX" to remain in the code when designing the FragNStein driver. These
> references were immediately removed once they were discovered.

Opp. at 8 (record citations omitted). This admission of literal copying, together with (i) the

strong evidence that defendants had access to plaintiffs' source code, and (ii) the well-supported

declaration of plaintiffs' expert concluding that commonality of authorship simply does not

explain the similarities of the programs, is more than ample evidence for plaintiffs to show that

defendants have created an unauthorized derivative work in violation of plaintiffs' rights under §

106 of the Copyright Act. Thus, plaintiffs have clearly shown a strong likelihood of success on

the merits of their copyright infringement claim. *Real Truth*'s first element is therefore satisfied.

## B. Likelihood of Irreparable Harm

Plaintiffs have also made a clear showing that they are likely to be harmed irreparably absent preliminary injunctive relief. This is so because allowing defendants to continue to distribute products containing plaintiffs' copyrighted work would "deprive the copyright holder of intangible exclusive rights" to control the means and methods by which its work will be seen by the public. *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007). In other words, allowing defendants to continue to distribute plaintiffs' copyrighted work—particularly when the record reflects that plaintiffs have not licensed the use of the copyrighted code in any third party's devices—would significantly diminish the intangible value of the work to plaintiffs in a manner that could not be cured by damages alone. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–93 (2006) (noting importance of right to exclude in considering copyright injunction requests and applying principle by analogy to patent case); *Phelps*, 492 F.3d at 544.

In response, defendants merely note that plaintiffs delayed for eight months from the discovery of infringement before requesting preliminary injunctive relief. Plaintiffs respond that during this time, they (i) attempted to persuade defendants to cease the infringing action without resort to litigation, but were met with stonewalling by defendants, and (ii) retained an expert to confirm infringement and compile the evidence necessary to make the requisite "clear showing" of a likelihood of success in a copyright action. Additionally, defendants note that they did not discover the full extent of defendants' infringement until March 2010, shortly before filing this action.

The record reflects that plaintiffs did not unreasonably delay the commencement of this action, and that to the contrary, they sought an efficient out-of-court resolution of this matter. Ultimately, once they were convinced that defendants would not cease their infringing conduct absent injunctive relief, and once the scope of defendants' infringing conduct became clear, they promptly brought this action and filed the instant motion. Thus, plaintiffs did not waive any right to preliminary injunctive relief on account of delay. *See Eve of Milady v. Impression Bridal, Inc.*, 957 F. Supp. 484, 490–91 (S.D.N.Y. 1997) (holding that efforts to resolve matter without litigation did not suggest absence of irreparable harm). As it is clear from this record that plaintiffs have shown a clear likelihood of irreparable harm absent injunctive relief, the second requirement of *Real Truth* is satisfied.

C. Balance of Equities

Plaintiffs have further shown that the balance of equities tips decisively in their favor.[11] Specifically, plaintiffs have demonstrated that defendants have been profiting from the sale of a product that uses plaintiffs' copyrighted firmware program as the software backbone of the device, and also uses plaintiffs' copyrighted drivers as the conduit to hardware consoles. Equity requires that defendants be ordered to cease their unlawful conduct, and that plaintiffs' intangible right to control the means and methods by which their copyrighted work is seen by the public be restored. In these circumstances, the injunction requested by plaintiffs—which prohibits

---

[11] While older cases have referred to this factor as the "balance of hardships" test, *Winter* and *Real Truth* more appropriately use the term "equities" instead of "hardships." After all, a company whose business relies exclusively on copyright infringement would surely suffer a serious *hardship* if it were ordered to cease its infringing activity; nonetheless, in such a case, *equity* would not favor a defendant's profitmaking from wrongful activity, and thus an injunction would ordinarily issue.

defendants only from selling or offering for sale any devices *containing the copyrighted code*—is

no more extensive than necessary to protect plaintiffs' intangible interests in their copyrighted

works. *See Christopher Phelps*, 492 F.3d at 545.

Defendants' protestation that an injunction would destroy their business is unavailing, for

accepting this argument would allow injunctions to issue against companies that infringe in only

a small part of their business, while protecting enterprises built around copyright infringement.[12]

Defendants are free to sell these same pieces of hardware as long as they reprogram them to

contain firmware and use drivers that do not infringe on plaintiffs' copyrights. Accordingly, the

narrowly crafted injunction that plaintiffs request would not "encumber a great deal of property

unrelated to the infringement." *Id.* Thus, *Real Truth*'s third factor is plainly satisfied on the

existing record.

## D. Public Interest

Finally, the public interest is served by granting the relief requested. In enacting the

Copyright Act, Congress has indicated that the public interest is served by upholding copyright

owners' exclusive statutory rights to control the use of their work.[13] The public therefore would

not be served by allowing defendants' copyright infringement to continue unabated; indeed, to

the contrary, "the public has an interest in preventing . . . the infringement of copyrights." *Bowe*

---

[12] *See Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (rejecting argument about "devastating effect" of injunction in copyright case because "[i]f that were the correct standard, then a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone") (citing cases).

[13] *See id.* ("Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.").

*Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005). Accordingly, the record reflects that the public interest is best served by granting plaintiffs' motion and thus the fourth requirement of *Real Truth* is met here.

## IV.

In sum, the record amply reflects that plaintiffs have satisfied the four requirements for issuance of preliminary injunctive relief on their copyright claim. Specifically, plaintiffs have shown (i) that they are likely to succeed on their copyright infringement claim at trial, (ii) that they are likely to suffer irreparable harm absent preliminary injunctive relief, (iii) that the balance of equities favors granting preliminary injunctive relief, and (iv) that the public interest is best served by granting preliminary injunctive relief. Accordingly, plaintiffs' motion is appropriately granted.

A separate Order shall issue.

Alexandria, Virginia
July 22, 2010

/s/

T. S. Ellis, III
United States District Judge